# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

FOOD LINER, )
)
      Appellants, )
)
v. )    C.A. No. N16A-09-015 CEB
)
NICKEYA HARRIS )
)
      Appellees. )

Submitted: January 30, 2017
Decided: May 1, 2017

## ORDER

*Upon Consideration of Appeal from the*
*Industrial Accident Board.*
### AFFIRMED

We are presented with the appeal of Food Liner ("Employer") from a decision of the Industrial Accident Board (the "Board"), finding that a young woman should be preapproved to undergo a second surgery on her shoulder. Finding no error warranting reversal and substantial evidence in support of the decision, the Court will affirm the Board's findings.

## BACKGROUND

Nickeya Harris ("Ms. Harris") had a job with Food Liner cleaning out tanker trucks with a hose. On December 12, 2013, she injured her shoulder while so

1

occupied, trying to free a hose that had become frozen on the ground in spilled corn syrup. None of this is particularly noteworthy or disputed.

Ms. Harris collected disability benefits throughout 2014 and eventually required shoulder surgery, which was completed in February, 2015. That surgery was performed by Dr. Crain, but the postoperative period remained problematic for Harris. She continued to complain of pain in her shoulder.

Ms. Harris' response to the surgery is subject to some dispute that we will discuss presently. But the rest of the history is that she eventually contacted Dr. Morgan, a leading specialist in shoulder surgery, who examined her and opined that she needed a second shoulder surgery. Under Board rules, Ms. Harris submitted a request for a predetermination that the second shoulder surgery was "reasonable and necessary" so that it would be considered a compensable workplace related injury. Employer obtained a second medical opinion from a different surgeon named Dr. Stevens, who felt that surgery was not indicated, noting that she had not fully embraced physical therapy after the initial surgery.

Ms. Harris then consulted a third surgeon – a shoulder specialist – Dr. Craig Morgan, who opined that she needed a second surgery on her shoulder. This was the surgery for which Harris sought approval through the worker's compensation rules.

The dispute worked its way to the Industrial Accident Board, which is empowered to make *de novo* findings. The Board heard deposition testimony from Drs. Crain, Morgan and Stevens, as well as the live testimony of Ms. Harris. In a well written, clear, thirteen page opinion, the Board ruled in favor of Ms. Harris, finding that the second surgery was "reasonable and necessary" for her recovery from her workplace injury. Employer has appealed on several grounds.

## STANDARD OF REVIEW

The parties are in agreement on the standard of review. This Court's duty on appeal from the Board "is to determine whether the Board's decision is supported by substantial evidence and free from legal error."[1] "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[2] "Substantial evidence requires 'more than a scintilla but less than a preponderance' to support the finding."[3] On appeal, the Superior Court does not sit as a trier of fact with authority to weigh the evidence, determine questions of credibility, and make its own factual findings and conclusions.[4] The Superior

---

[1] *Miller v. Lutheran Senior Serv.*, 2010 WL 702424, at *2 (Del. Super. Jan. 5. 2010).

[2] *Gargano v. Food Lion*, 2012 WL 5830695, at *7 (Del. Super. June 19, 2012).

[3] *Hines v. Delaware Recyclable Prod.*, 2003 WL 22293656, at *3 (Del. Super. Oct. 1, 2003).

[4] *Johnson v. Chrysler Corporation*, 213 A.2d 64, 66-67 (Del. 1965).

3

Court may not overturn a factual finding of the Board unless there is no satisfactory proof supporting the Board's finding.[5]

## DISCUSSION

Employer's first and most vociferous argument is that the Board erred in a post decision ruling. The basis for this complaint has to do with Ms. Harris' post-surgical physical therapy. At the Board hearing, Harris testified on direct examination that after the surgery with Dr. Crane, she was directed to physical therapy.[6] She went to therapy at ATI, located in the same building as Dr. Crane and had a therapist named Cathy.[7] But she went for "a very short time" because "the pain was unbearable."[8]

There followed cross examination in which Ms. Harris explained that she first met Dr. Crain in the summer of 2014[9] and had the surgery in February, 2015.[10] She was referred to physical therapy in April, 2015 by Dr. Crane[11] and accepted

---

[5] *Id.*

[6] Board Ex. 3 at 34-35.

[7] Board Ex. 3 at 35.

[8] *Id.*

[9] Board Ex. 3 at 46.

[10] *Id.*

[11] Board Ex. 3 at 46-47.

4

Employer's counsel's suggestion that it was "about a dozen times."[12] A later note in Crane's file in July, 2015 regarding Ms. Harris' physical therapy apparently indicated that she was doing therapy at home but could not attend sessions at ATI due to a transportation issue. This note was contested by Harris at the hearing[13] who claimed she did not have a transportation issue with getting to therapy. What she did have, and testified to, was a bad experience in physical therapy. Ms. Harris testified that she went to ATI therapy in April and May, although only one bill was produced, which suggested that she stopped attending. Ms. Harris never disputed that she stopped attending, but she was able to provide details as to exactly what exercises she did when she did go to therapy the few times she attended.[14]

In its decision, the Board found that Ms. Harris did not follow through with physical therapy after the first surgery. Dr. Morgan, whom the Board found to be the most credible of the surgeon witnesses to offer testimony in the case, testified that physical therapy would not have served Harris well anyway, since her condition would not remediate with physical therapy and she needed surgery to remove adhesions that had developed after the first surgery. The adhesions would

---

[12] *Id.*

[13] Board Ex. 3 at 48-52.

[14] Board Ex. 3 at 61-62.

not resolve with physical therapy and her failure to engage made no difference in Dr. Morgan's diagnosis and assessment.

Still, Employer complains that after the hearing, Employer secured records from ATI that indicated Ms. Harris appeared for an evaluation on May 28, 2015 and stopped coming after that, leading her to be discharged as an ATI client. Employer claims this is proof of Ms. Harris' "perjury" before the Board and the Board failed to consider it either in its initial decision or on a motion for reargument after rendering its initial decision. We think Employer is making a good bit more of this than is actually there.

According to the record, ATI is a physical therapy office located in the same building as Dr. Crane's office.[15] And it is quite clear from the record that Ms. Harris underwent some physical therapy, somewhere. She testified, for example, that she attended a session in April – presumably at ATI – at which "I went to see Ms. Cathy and that's when she sat down and made a schedule for me, told, me, they gave me a pulley, told me to do at home exercises and to start moving my arm. And basically told me, she gave me charges and everything that I'll be doing when I come to physical therapy."[16] Later, she testified "the nerve stimulator was probably the best part I had. And, actually, it gave me a little bit of a relief that I

---

[15] Board Ex. 3 at 60.

[16] Board Ex. 3 at 59.

6

went out and got my own"[17] and still later, "I would take my right arm and would go like this and they were just simple five times. And by the second time I was like, hey, can we stop and do something different. She was, like, well, I need you to do that. Like, that hurts. It felt like it was ripping even more."[18]

So, what of all this? The Board found as a fact that Ms. Harris did not really participate in physical therapy and the Board based its decision largely on the opinion of the shoulder surgery specialist, Dr. Morgan, who testified that physical therapy would not have helped anyway. So Employer's argument that the Board improperly failed to consider evidence that would have further undercut Ms. Harris' credibility as to her efforts at physical therapy simply do not take the Employer very far.

The issue before the Board was not, as it might be in a "normal' tort lawsuit, whether a plaintiff mitigated her damages by doing the mandated physical therapy. Rather, the question was whether the second surgery was "reasonable and necessary." The Board was clear eyed in its analysis; Ms. Harris needed a second surgery due to adhesions that would not be improved through physical therapy. Although Employer had a surgeon that opined that one had to do physical therapy

---

[17] Board Ex. 3 at 61.

[18] Board Ex. 3 at 62.

7

before reaching that conclusion, Ms. Harris had a surgeon who testified that one did not and that was the surgeon the Board chose to believe.

Thus, in response to the Employer's request to the Board that it reconsider its initial decision in light of its evidence that Ms. Harris was removed from the rolls at ATI because she stopped coming, the Board's decided that "presentation of additional physical therapy records would not alter the decision or the Board's view on Ms. Harris' credibility."[19] If Harris had testified she was faithful to a physical therapy regimen and her testimony was credited by the Board, Employer would have a far more compelling argument. Given the concession, by both Ms. Harris and the Board, that she was noncompliant with physical therapy and the credible expert opinion that it would not have mattered anyway, the Court has little difficulty concluding that the Board acted well within its authority in so concluding and will not reverse its decision on this basis.

The second claim raised by the Employer here is that Dr. Morgan was improperly allowed to testify to an MRI result that Morgan identified as having been taken "post-surgical" even as he incorrectly identified the date of the surgery as February, 2014 (the surgery actually took place in February, 2015). The Employer's complaint is really two-fold: first that the MRI was not produced in

---

[19] Board Ex. 11 at 2.

discovery and second that Morgan incorrectly identified the date of the surgery and thus, may have incorrectly identified the date of the MRI.

Morgan testified by way of deposition. The deposition was taken at his medical office in June of 2016. With regard to the MRI, Dr. Morgan testified to the following:

Witness: The MRI confirmed the degeneration of the disc material in the AC joint, and confirmed the presence of subacromial subdeltoid adhesions, which are tethering her rotator cuff like the check rein on a horse. It wouldn't let it move right.

Mr. Hunt: Doctor, I'm sorry, let me interject for a second. What was the date of that MRI?

Witness: Let's see. It's a postsurgical MRI, so it's sometime after 2-23-14. I don't have the date of it because I don't have a copy of it now.

Mr. Hunt: Okay. I'm just going to object for the record that that MRI report was not produced.

Witness: I don't care about the report. The report—in my experience as a shoulder surgeon, seeing about a thousand shoulders a year, the report – the MRI reports are wrong over 50 percent of the time. . . So I don't have a copy of the report in my chart, nor do I care. But she brought the disc and I looked at it.[20]

Like its claim about Ms. Harris' credibility, Employer would have more to argue about if Dr. Morgan testified that the MRI was a valuable tool in his assessment of the need for additional surgery. Would it have been neater if the

_____

[20] Board Ex. 5 at 9.

date of the MRI had been cleared up on the record? Yes. It would. But the Court is not willing to send this case back to the Board because a doctor got the date of the surgery right but booted the year by one. Indeed, "it's post surgical, so it's sometime after 2-23-14" is not even a reference to the MRI itself, which the doctor obviously did not have in front of him, but rather to his own recollection of when the surgery occurred, uttered in connection with a sentence about consulting the MRI. Because it was not exploited in cross examination, it is quite likely that in context, neither side thought much of it until seeing the transcript a good while later.

Is there any evidence that the MRI was not, in fact, postsurgical? No, there is not. Moreover, there is no evidence that Morgan relied on the MRI; in fact he specifically repudiated reliance on the MRI. Had he relied on it, Employer would have a colorable case to make about its importance in this dispute.

Once again, the Court believes the Employer has gotten lost in its argument. A bare evidentiary question was raised, but the issue before the Board was whether the second surgery was "necessary and proper," not whether the MRI was reliable. The Board heard from an expert with 35 years of experience, who does "75 to 80 percent" of his surgeries on shoulders and performs approximately 700 shoulder surgeries each year.[21] The Board credited the expert's opinion, which was

---

[21] *Id.* at 19.

grounded in a depth of experience and his physical exam of the patient. The Employer was never going to win the day by resort to an MRI whose reliability the credible expert repudiated. The Court can thus see why the Board ruled that any error in the recitation of the date of the surgery or his review of the MRI film was "immaterial" to its decision.

The Board ruled as it did because it was satisfied that Ms. Harris' request for a second surgery was reasonable and necessary. It did so by crediting Ms. Harris' medical expert and not crediting Employer's medical expert. Satisfied as we are that the Board acted properly and substantial evidence supports its decision, the ruling by the Board will be affirmed.

**IT IS SO ORDERED.**

Judge Charles E. Butler

11